UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

JOAQUIN HERNANDEZ-AYALA,

Petitioner,

v.

RENEE BAKER, *et al.*,

Respondents.

Case No. 3:13-cv-00134-MMD-WGC

ORDER

## I.    SUMMARY

Petitioner Joaquin Hernandez-Ayala filed a petition for writ of habeas corpus ("Petition") under 28 U.S.C. § 2254. (ECF No. 11.) This matter is before the Court for adjudication of the merits of the Petition. For the reasons discussed below, the Court denies the Petition, denies a certificate of appealability, and directs the Clerk of the Court to enter judgment accordingly.

## II.   BACKGROUND

Petitioner's convictions are the result of events that occurred in Clark County, Nevada on or between January 14, 2006 and August 27, 2006. (ECF Nos. 12-9 at 2, 13-3 at 2.) J.F., Petitioner's stepdaughter, testified that when she was five years old, Petitioner touched her on the inside of her vagina with his middle finger while her mother was at work. (ECF No. 12-17 at 99–100, 108–110, 114.) Previously, J.F. told law enforcement that Petitioner "touched . . . her private areas . . . a lot" and had touched her "[o]n her buttocks." (ECF No. 12-22 at 56–57, 59–60, 64.) Additionally, J.F.'s aunt testified that J.F.'s brother, G.F., who was four at the time, told her that Petitioner rubbed G.F.'s penis. (ECF No. 12-17 at 123–24.)

Following a jury trial, Petitioner was found guilty of one count of sexual assault

with a minor under fourteen years of age regarding J.F. and one count of lewdness with a child under fourteen years of age regarding J.F. (ECF No. 13-2 at 2–3.) Petitioner was sentenced to life with the possibility of parole after twenty years for the sexual assault count and life with the possibility of parole after ten years for the lewdness count, to run concurrent to the sexual assault count. (*Id.*) Petitioner appealed, and the Nevada Supreme Court affirmed on August 5, 2009. (ECF No. 13-22.) Remittitur issued on September 1, 2009. (ECF No. 13-24.)

Petitioner filed a state habeas petition on April 6, 2010. (ECF No. 13-28.) The state district court denied the petition on September 8, 2010. (ECF No. 13-34.) Petitioner appealed, and the Nevada Supreme Court reversed and remanded for the appointment of counsel to assist Petitioner in his post-conviction proceedings. (ECF No. 13-36.) Petitioner filed a counseled, supplemental petition on June 2, 2011. (ECF No. 14-2.) The state district court denied the supplemental petition on October 10, 2011. (ECF No. 14-7.) Petitioner appealed, and the Nevada Supreme Court affirmed on February 13, 2013. (ECF No. 14-22.) Remittitur issued on March 12, 2013. (ECF No. 14-23.)

Petitioner's federal habeas petition was filed on May 15, 2013. (ECF No. 5.) Petitioner filed a counseled, amended petition on October 9, 2013. (ECF No. 11.) Respondents moved to dismiss the amended petition. (ECF No. 18.) Petitioner responded to the motion and moved for a stay and abeyance. (ECF Nos. 25, 26.) This Court determined that Grounds Five, Six, Seven, and Nine were unexhausted and granted the motion to stay pending exhaustion. (ECF No. 35 at 4.)

Petitioner filed a second state habeas petition on February 26, 2015. (ECF No. 37-1.) The state district court denied the petition on July 27, 2015. (ECF No. 37-5.) The Nevada Court of Appeals affirmed the denial of Petitioner's second state habeas petition on June 22, 2016. (ECF No. 37-11.) Remittitur issued on July 19, 2016. (ECF No. 37-12.)

Petitioner moved to reopen his federal case on September 8, 2016. (ECF No. 36.) This Court granted the motion. (ECF No. 39.) Respondents again moved to dismiss.

1  (ECF No. 41.) This Court granted the motion, dismissing Grounds Five, Six, Seven, and

2  Nine as procedurally defaulted. (ECF No. 48 at 5.) Respondents answered the remaining

3  grounds in the amended petition on April 18, 2018. (ECF No. 51.) Petitioner replied on

4  November 5, 2018. (ECF No. 56.)

5  In his remaining grounds for relief, Petitioner asserts the following violations of his

6  federal constitutional rights: (1) the police used coercive tactics to obtain his incriminating

7  statements; (2) his right to confront the witnesses against him was violated when the state

8  district court admitted numerous out-of-court statements; (3) the state district court

9  admitted a prejudicial out-of-court statement; (4) his trial counsel failed to challenge the

10  accusations against him at trial; (5) his appellate counsel failed to argue on appeal that

11  there was legally insufficient evidence to support his lewdness conviction. (ECF No. 11 at

12  9-29.)

13  **III.    LEGAL STANDARD**

14  28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in

15  habeas corpus cases under the Antiterrorism and Effective Death Penalty Act

16  ("AEDPA"):

17
18  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings

19  unless the adjudication of the claim --

20
21  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

22
23  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

24

25  28 U.S.C. § 2254(d).

26  A state court decision is contrary to clearly established Supreme Court precedent,

27  within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts

28  the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts

3

a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

## IV. DISCUSSION

The Petition asserts five remaining grounds for relief. The Court will address each ground in turn.

### A. Ground One

In Ground One, Petitioner alleges that his federal constitutional rights were violated when the police used coercive tactics to obtain his incriminating statements. (ECF No. 11 at 9.) Petitioner elaborates that the police used psychological and physical

4

coercion—including using physical force, handcuffing him to a bar during the interrogation, and forcing him to stay in a cold room—to pressure him into making an incriminating statement. (*Id.* at 11.) In Petitioner's appeal of his judgment of conviction, the Nevada Supreme Court held:

> Hernandez-Ayala contends that the district court erred in admitting his statement to the police because his statement was coerced.

> Due process requires that any confession admitted at trial be voluntary. *Passama v. State*, 103 Nev. 212, 213, 735 P.2d 321, 322 (1987). That is, a confession cannot be admitted into evidence unless "it is made freely and voluntarily, without compulsion or inducement." *Id.* A voluntary confession is the "product of a 'rational intellect and a free will.'" *Id.* at 213-14, 735 P.2d at 322-23. (quoting *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960)). A confession is involuntary if "coerced by physical intimidation or psychological pressure." *Id.* (citing *Townsend v. Sain*, 372 U.S. 293, 307 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1, 5 (1992)). A district court's decision regarding the voluntariness of a defendant's confession "will not be disturbed on appeal if it is supported by substantial evidence." *Allan v. State*, 118 Nev. 19, 23-24, 38 P.3d 175, 178 (2002), *overruled on other grounds by Rosky v. State*, 121 Nev. 184, 190-91, 111 P.3d 690, 694 (2005). "Substantial evidence is that which a reasonable mind might consider adequate to support a conclusion." *Steese v. State*, 114 Nev. 479, 488, 960 P.2d 321, 327 (1998).

> Hernandez-Ayala contends that the district court erred in admitting his statements because he made allegations below that police officers put a gun to his head and beat him prior to his statement. The district court found that his statement was not coerced because the videotape of Hernandez-Ayala's statement showed that he was relaxed, he never complained of mistreatment, officers brought him hot tea because he said that he was cold, and the video and his booking photo showed no evidence of a beating.

> We conclude that the district court did not err in admitting the statement because there was no evidence presented demonstrating that the statement was coerced. Hernandez-Ayala directs us to no evidence demonstrating coercion and appears to argue that the district court should not have admitted the statement purely on the basis that he made an allegation of coercion. Rather, the district court's finding is supported by substantial evidence.

(ECF No. 13-22 at 3–4.) The Nevada Supreme Court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

The admission into evidence at trial of an involuntary confession violates a defendant's right to due process under the Fourteenth Amendment. *Lego v. Twomey*,

404 U.S. 477, 478 (1972); *Jackson v. Denno*, 378 U.S. 368, 376 (1964) ("It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession"); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000) (explaining that the requirement that *Miranda* rights be given prior to a custodial interrogation does not dispense with a due process inquiry into the voluntariness of a confession). An inculpatory statement is only voluntary if it is the product of rational intellect and free will. *Blackburn*, 361 U.S. at 208. "[C]oercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (internal quotation marks omitted).

Detective Enrique Hernandez interviewed Petitioner on August 27, 2006, from 5:18 a.m. to 7:00 a.m. (ECF No. 12-2 at 2, 39.) At the beginning of the interview, both parties acknowledged that the interview room was cold, and during the interview, Detective Hernandez brought Petitioner hot water and tea. (*Id.* at 2-3, 34.) Following Detective Hernandez's reading of Petitioner's *Miranda* rights, Petitioner stated that he understood his rights. (*Id.* at 7.) Petitioner explained that he touched the outside of J.F.'s vagina while bathing her, but he denied touching the inside of J.F.'s vagina. (*Id.* at 10–12.) After Detective Hernandez explained that someone had touched the inside of J.F.'s vagina, Petitioner explained that it was not him. (*Id.* at 13.) Later in the interview, Detective Hernandez stated:

> I have done this for a long time. It is not my first day okay. I came from the hospital. I talked to the doctors. I have the DNA, we have enough. We have all we need to say it did happen, and I know it happened. I know it happened [Petitioner]. And you can't look at me in the eyes and deny it. And I know you can't do that. Because you are [a] good human person who can not lie.

(*Id.* at 25.) Petitioner then stated, "I did touch her, I did make the attempt, I made the attempt, I am not going to deny that. . . . When I tell you that at no time have I stuck my finger in her, is because the truth is that I only made the attempt." (*Id.*) Petitioner then

6

demonstrated how far he inserted his finger into J.F.'s vagina and commented, "[i]f the girl shows more than that. You need to investigate somewhere else, because it wasn't me." (*Id.*)

When asked how many times this incident happened, Petitioner responded, "[o]ne time" and explained, "I had the intention but . . . I did not do it. . . . Some times [sic] the girl would provoke me." (*Id.* at 28.) Petitioner elaborated, "[s]ometimes [J.F.] would go to her room[,] . . . take her clothes off and come out[,] . . . [s]o I resisted." (*Id.* at 29.) Petitioner stated that he "was going to look for help but [he] didn't do it because [he] didn't want [his] wife to suspect anything." (*Id.* at 35.) Petitioner also admitted regret and commented, "I know I didn't have to tell you anything if I didn't want to. . . . But I have the advantage that I didn't—that I had enough time to do more things and I didn't do it." (*Id.* at 36–37.) Finally, Petitioner stated, "I don't feel that I have done such a bad thing to have to get an attorney." (*Id.* at 37.)

During the trial, outside the presence of the jury, the State informed the state district court that a hearing may need to be held to determine whether Petitioner's police interview statements were coerced because Petitioner "made allegations . . . in . . . an internal affairs complaint . . . claiming that [the police officers] beat him to get a confession out of him." (ECF No. 12-17 at 28.) The following day, again outside the presence of the jury, Petitioner orally moved to suppress his police interview statement. (ECF No. 12-22 at 42.) Petitioner explained that on the way to his police interview he was beaten, hit in the back of the head, and had a gun held to his head. (*Id.* at 42–43.) Petitioner also cited issues with the room's temperature and the fact that "his arm [was] handcuffed to a bar" during the interview. (*Id.* at 43.) Petitioner explained that after the interview was over and he was being transported to the Clark County Detention Center, "his nose started to bleed . . . as a result of what had happened earlier" on his way to give his interview. (*Id.* at 44.) The state district court denied Petitioner's motion, finding, in part, that "if he was beaten and coerced so bad, it would appear to the Court that he would have . . . been coerced in the very beginning and he would have given his confession" right away as

opposed to waiting until the end of the interview to confess. (*Id.* at 49.)

Detective Hernandez testified at Petitioner's trial that he first contacted Petitioner while he was in the back of a patrol car. (ECF No. 12-22 at 67, 69.) After being told why he was under arrest and being read his *Miranda* rights, Petitioner indicated that he wished to speak to Detective Hernandez, and, as such, Petitioner was moved to Detective Hernandez's vehicle and transported to Detective Hernandez's office. (*Id.* at 69–70.) Petitioner was the only passenger in Detective Hernandez's vehicle. (*Id.* at 70.) During the interview, which was conducted exclusively in Spanish, Petitioner "was handcuffed to [a] pole." (*Id.* at 71–72.) Detective Hernandez admitted that the interview room was cold, but he explained that he "tried to alleviate that [issue] by giving [Petitioner] something hot to drink." (*Id.* at 73.) Detective Hernandez testified that he did not threaten or physically harm Petitioner and that Petitioner was not mistreated by anyone in the police department. (*Id.* at 73, 78; *see also id.* at 66 (testimony from Detective Shannon Tooley that she watched portions of Petitioner's police interview and did not "see [Petitioner] being mistreated by Detective Hernandez").)

The Nevada Supreme Court reasonably determined that Petitioner failed to present evidence that his statement was coerced. Petitioner failed to present any evidence that he was beaten up, hit in the back of the head, or had a gun pointed at his head. *See Jones v. Gomez*, 66 F.3d 199, 205 (9th Cir. 1995) ("Jones's conclusory allegations did not meet the specificity requirement. The district court did not err in denying habeas relief on this ground."). In fact, Petitioner acknowledges that the police interview videotape and his booking photographs show no injuries.[1] (ECF No. 56 at 10; *see also* ECF No. 12-21.) Regarding Petitioner's other allegations of coercion, Detective Hernandez admitted that the interview room was cold, that Petitioner was handcuffed to a pole, and that he only told Petitioner that he expected to be able to retrieve DNA evidence implicating Petitioner in order to elicit a response from Petitioner. (*See* ECF

---

[1]Petitioner argues that his injuries were to his body, not his face, so there would not have been anything to see in the videotape or booking photographs. (ECF No. 56 at 10.)

8

No. 12-22 at 71–74.) However, it cannot be concluded that these commonplace interrogation occurrences overcame Petitioner's rational intellect and free will. *Blackburn*, 361 U.S. at 208. Indeed, Detective Hernandez attempted to alleviate the cold temperature concerns by giving Petitioner hot tea, explained that Petitioner was handcuffed to make sure he was secure, and stated that commenting on what the DNA evidence will demonstrate is a common interview technique. (ECF No. 12-22 at 71, 73–74.) Moreover, Petitioner commented during the interrogation that "[he] kn[e]w [he] didn't have to tell [Detective Hernandez] anything if [he] didn't want to." (*Id.* at 36–37.) Because the Nevada Supreme Court reasonably denied Petitioner's claim that his confession was involuntary based on a lack of coercion, *Connelly*, 479 U.S. at 167, Petitioner is denied federal habeas relief for Ground One.

## B. Ground Two

In Ground Two, Petitioner alleges that his right to confront the witnesses against him was violated when the state district court admitted numerous out-of-court statements from J.F.'s mother, J.F.'s aunt, and Detective Tooley.[2] (ECF No. 11 at 11–13.) In Petitioner's appeal of his judgment of conviction, the Nevada Supreme Court held:

> Hernandez-Ayala contends that the district court erred in admitting hearsay statements that the victim made to her mother, her aunt, and a detective, for two reasons: (1) these statements violated the Confrontation Clause and (2) the statements effectively bolstered the victim's testimony.

> Generally, "[a] trial court's evaluation of admissibility of evidence will not be reversed on appeal unless it is manifestly erroneous." *Medina v. State*, 122 Nev. 346, 353, 143 P.3d 471, 476 (2006). Under *Crawford v. Washington*, 541 U.S. 36 (2004), "when the declarant is unavailable, reliability assessments of testimonial hearsay cannot survive scrutiny under the Confrontation Clause without actual confrontation." *Pantano v. State*, 122 Nev. 782, 789, 138 P.3d 477, 481 (2006).

> We conclude that because the victim testified and Hernandez-Ayala was offered the opportunity to cross-examine her, there is no Confrontation Clause violation. [Footnote 1: Hernandez-Ayala chose not to cross-examine the victim at trial.] *Pantano*, 122 Nev. at 790, 138 P.3d at 482. We further

---

[2]Petitioner appears to only take issue with J.F.'s out-of-court statements, not G.F.'s out-of-court statements. (*See* ECF No. 56 at 14 (arguing that "permitting these witnesses to testify as to J.F.'s out-of-court accusations . . . unfairly magnified her testimony and deprived [Petitioner] of his right to confront his accuser"). Indeed, Petitioner was not convicted of any accusations regarding G.F. (*See* ECF No. 13-2 at 2–3.)

conclude that, as discussed below, the hearsay statements were properly admitted and, particularly given the young age of the child, [Footnote 2: The victim was six years old and starting kindergarten.] were not so cumulative as to amount to vouching for the victim's testimony or unduly prejudicing the case. *See Felix v. State*, 109 Nev. 151, 200, 849 P.2d 220, 253 (1993). The evidence strongly supported the verdict—particularly, Hernandez-Ayala's inculpatory statement to the police, which was consistent with the victim's statement.

*Statements to family members*

Child victim hearsay statements are admissible if the statements meet the requirements of NRS 51.385 and the United States Constitution. *Felix*, 109 Nev. at 200, 849 P.2d at 253. NRS 51.385(1) allows the admission of the child's hearsay statement regarding sexual conduct if the child is under the age of ten and: "(a) [t]he court finds, in a hearing out of the presence of the jury, that the time, content and circumstances of the statement provide sufficient circumstantial guarantees of trustworthiness; and (b) [t]he child testifies at the proceeding or is unavailable or unable to testify."

In this case, the district court held a hearing regarding the testimony of the mother and aunt, found that the statements made by the child victim were spontaneous, and that any questioning conducted by the mother and aunt of the child was limited and within the scope of proper parental or familial concern. NRS 51.385(2). Thus, the district court correctly applied NRS 51.385 in determining the reliability of the child victim's statements.

*Statement to police officers*

Hearsay is a statement offered to prove the truth of the matter asserted unless the "declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is: (a) [i]nconsistent with [her] testimony." NRS 51.035(2).

In the present case, (1) the victim testified to one act of sexual assault and testified that she did not remember talking to a police officer; (2) Detective Shannon Tooley testified that the victim had made a statement to her during investigation that Hernandez-Ayala had touched her on her "private areas a lot," including her buttocks, demonstrating that the statement was inconsistent with the victim's testimony; and (3) the victim was subject to cross-examination, although defense counsel chose not to exercise that right. Thus, the statement was properly admitted as an inconsistent statement of the child declarant.

(ECF No. 13-22 at 4–6.) The Nevada Supreme Court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

The state district court held a hearing outside the presence of the jury to evaluate J.F.'s and G.F.'s out-of-court statements. (*See* ECF No. 12-17 at 6.) The state district court heard testimony from Blanca Zaragoza (hereinafter "Blanca"), the aunt of J.F. and

G.F.; Betel Zaragoza (hereinafter "Betel"), the mother of J.F. and G.F.; and G.F. (*Id.* at 14–27, 34–43.) The state district court held that it would allow Betel to testify about J.F.'s statements and Blanca to testify about J.F.'s and G.F.'s statements. (*Id.* at 52.) The state district court also held that G.F. was "unable to testify, because he [was] not competent." (*Id.* at 52–53.)

Thereafter, Betel testified before the jury that she learned of J.F.'s accusations against Petitioner through her sister-in-law, Christina, after she finished work one day. (ECF No. 12-17 at 72–73, 80, 82.) After hearing the accusations, Betel took J.F. into Betel's sister-in-law's bedroom, and "[t]hen [J.F.] told [her] . . . that [Petitioner] had touched her." (*Id.* at 83–84.) Specifically, Betel explained that J.F. told her "[t]hat [Petititioner] had sticked [sic] his finger inside of her vagina." (*Id.* at 84.) Betel then took J.F. to the hospital. (*Id.* at 88.)

Next, J.F., who was six years old at the time of Petitioner's trial, testified that when she was five years old, Petitioner touched her on the inside of her vagina with his middle finger. (ECF No. 12-17 at 99–100, 108–09, 114.) This touching occurred while J.F.'s mother was at work. (*Id.* at 110.) J.F. testified that Petitioner did not touch her anywhere else and, specifically, that Petitioner did not "touch[ her] on [her] butt." (*Id.* at 110, 113.) J.F. also testified that she did not remember talking to a police officer while in the hospital. (*Id.* at 111.)

Third, Blanca testified that on August 27, 2006, she was bathing J.F. and G.F. (ECF No. 12-17 at 117, 121.) As Blanca was "wash[ing J.F.'s] private part," J.F. "yelled an ouch." (*Id.* at 121.) Blanca asked J.F. what was wrong, and J.F. "said that [Petitioner] put [his] hands on her . . . vagina." (*Id.* at 123.) Blanca then asked G.F. if Petitioner had ever touched him, and "[h]is response was, he did it like this. And then he touched his penis" and moved his hand back and forth. (*Id.* at 123–24.)

Finally, Detective Tooley testified that she responded to Sunrise Hospital on August 27, 2006, to investigate J.F.'s case. (ECF No. 12-22 at 56–57.) Detective Tooley interviewed J.F. and her aunt at the hospital. (*Id.* at 57.) J.F. told Detective Tooley that

she was "touched . . . on her private areas . . . a lot." (*Id.* at 59–60.) J.F. also told Detective

Tooley that Petitioner had touched her "[o]n her buttocks." (*Id.* at 64.)[3]

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal

prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses

against him." "[A] primary interest secured by [the Confrontation Clause] is the right of

cross-examination." *Douglas v. Alabama*, 380 U.S. 415, 418 (1965). While "the

Confrontation Clause guarantees an opportunity for effective cross-examination," it does

guarantee "cross-examination that is effective in whatever way, and to whatever extent,

the defense might wish." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (internal

quotation marks omitted); *see also Kentucky v. Stincer*, 482 U.S. 730, 739 (1987) ("[T]he

Confrontation Clause's functional purpose i[s] ensuring a defendant an opportunity for

cross-examination."). Regarding out-of-court statements admitted at trial, as is the case

at hand, the Confrontation Clause bars "admission of testimonial statements of a witness

who did not appear at trial unless he was unavailable to testify, and the defendant had

had a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 53–54.

Although the state district court admitted J.F.'s out-of-court statements through

the testimony of Betel, Blanca, and Detective Tooley, the Nevada Supreme Court

reasonably concluded that there was no Confrontation Clause violation. Indeed, J.F.

testified at Petitioner's trial, and even though Petitioner chose not to cross-examine J.F.,

he was offered the opportunity to do so. (*See* ECF No. 12-17 at 114.) Because J.F.

appeared at the trial and Petitioner had the opportunity to cross-examine her, there was

no Confrontation Clause violation, *Crawford*, 541 U.S. at 53–54; *Douglas*, 380 U.S. at

---

[3]It is noted that Petitioner objected to Detective Tooley testifying about J.F.'s statements on hearsay grounds. (ECF No. 12-22 at 60.) The State responded that J.F.'s prior statements to Detective Tooley in the hospital should be admitted as prior inconsistent statements since J.F. had testified the previous day that Petitioner did not touch her buttocks, Petitioner only touched her vagina once, and she did not recall speaking to a police officer at the hospital. (*Id.*) The state district court overruled Petitioner's objection, noting, in part, that a prior inconsistent statement is not hearsay, J.F. was subject to cross-examination, and J.F. could not be confronted with her prior statements because she could not read. (*Id.* at 61, 63.)

1     418, and the Nevada Supreme Court reasonably denied relief.

2         Petitioner is denied federal habeas relief for Ground Two.

3     **C.    Ground Three**

4         In Ground Three, Petitioner alleges that his right to a fair trial and right to confront

5     the witnesses against him were violated when the state district court admitted a

6     prejudicial out-of-court statement. (ECF Nos. 11 at 13, 56 at 14–15.) Specifically,

7     Petitioner alleges that Blanca made inadmissible hearsay statements to her sister, who

8     Petitioner was unable to cross-examine. (ECF Nos. 11 at 14, 56 at 15.) In Petitioner's

9     appeal of his judgment of conviction, the Nevada Supreme Court held:

10          Hernandez-Ayala contends that the district court erred in allowing a witness
            to testify regarding statements the victim made to a non-testifying adult.

11          We note that Hernandez-Ayala did not object to the testimony during trial,
12          thus we review for plain error. *See Green v. State*, 119 Nev. 542, 545, 80
            P.3d 93, 95 (2003); NRS 178.602.

13          During trial, the victim's aunt, Blanca Saragoza, testified that she was giving
14          the victim and her brother a bath, and when she began washing the victim's
            private area, she said it hurt. When Saragoza inquired why, the victim told
15          her that Hernandez-Ayala had digitally penetrated her. Sarazoga exited the
            bathroom and told some family members what the victim had said.
16          Sarazoga's older sister, Anna Blacencia, went into the bathroom and the
            victim repeated what she had told Saragoza. Blacencia did not testify at
17          trial.

18          It is not apparent from the record that the statement was sought to prove
            the matter asserted—that Hernandez-Ayala sexually assaulted the victim—
19          but rather to show how the statement affected Saragoza and the actions
            she took thereafter. However, even if the testimony was inadmissible
20          hearsay, Hernandez-Ayala did not demonstrate plain error. The testimony
            was nonspecific and evidence of Hernandez-Ayala's guilty was substantial
21          in that the victim testified that Hernandez-Ayala had digitally penetrated her
            and Hernandez-Ayala admitted to the conduct in his statement to the police.

22

23    (ECF No. 13-22 at 6–7.) The Nevada Supreme Court's rejection of this claim was neither

24    contrary to nor an unreasonable application of clearly established law as determined by

25    the United States Supreme Court.

26         After Blanca testified about J.F.'s and G.F.'s statements to her while they were in

27    the bathtub, the State asked Blanca, "what did you do?" (ECF No. 12-17 at 125.) Blanca

28    responded that she left the bathroom and because "most of [her] sisters and brothers

13

were there," she "told them what [J.F.] was telling [her]. And then [her] older sister[4] went in the bathroom . . . , and she again asked [J.F.] the same question. And [J.F.] again said the same thing to her." (*Id.*) Petitioner's trial counsel did not object to the foregoing testimony. (*See id.* at 125.)

The Supreme Court has explained that "[t]he [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford*, 541 U.S. at 59 n.9; *see also Tennessee v. Street*, 471 U.S. 409, 414 (1985) ("The *nonhearsay* aspect of Peel's confession—not to prove what happened at the murder scene but to prove what happened when respondent confessed—raises no Confrontation Clause concerns." (emphasis in original)).

Here, the Nevada Supreme Court reasonably determined that Blanca's testimony about Blancenia's statements was not hearsay. The Nevada Supreme Court explained that Blanca's testimony about Blancenia was not offered for the truth of the matter asserted—that Petitioner sexually assaulted J.F.—but rather to explain a separate issue: the actions Blanca took after hearing J.F.'s accusations. This finding was reasonable. Blanca's statement about Blancenia was in response to a question by the State asking Blanca "what did you do" following hearing J.F.'s accusations. (ECF No. 12-17 at 125.) Because Blanca was the first person to learn about J.F.'s accusations against Petitioner, the progression of events following that conversation were necessary to explain how future events—such as Blanca calling child protective services, telling Betel about the accusations, and informing Betel that J.F. needed to be examined at the hospital— unfolded. Accordingly, because the Nevada Supreme Court's conclusion that Blanca's testimony did not amount to hearsay was reasonable, there is no Confrontation Clause violation. *See Crawford*, 541 U.S. at 59 n.9; *see also Moses v. Payne*, 555 F.3d 742, 755-56 (9th Cir. 2009) (determining that "the state appellate court's analysis" that "the government did not introduce the testimony to prove the truth of the matter asserted . . . ,

_____

[4] The older sister's name is Anna Blacencia. (ECF No. 12-27 at 126.)

but rather to explain a separate relevant issue" was "consistent with *Crawford* and does not meet the criteria for habeas relief").

Petitioner is denied federal habeas relief for Ground Three.

### D.    Ground Four

In Ground Four, Petitioner alleges that his federal constitutional rights were violated when his trial counsel failed to challenge the accusations made by Blanca and J.F. (ECF No. 11 at 14–16.) In Petitioner's first state habeas appeal, the Nevada Supreme Court held:

> [A]ppellant argues that his trial counsel was ineffective for failing to cross-examine the victim to question whether the victim's aunt encouraged her to fabricate the allegations. Appellant fails to demonstrate that his counsel's performance was deficient or that he was prejudiced. Appellant's trial counsel stated on the record that he did not cross-examine the six-year-old victim because she discussed everything during direct examination that he would have questioned her about. This was a tactical decision and, as such, is "virtually unchallengeable absent extraordinary circumstances," *Ford v. State*, 105 Nev. 850, 853, 784 P.2d 951, 953 (1989), which appellant did not demonstrate. Further, counsel questioned the victim's aunt regarding her dislike of appellant and argued that the aunt's dislike of appellant led the aunt to coerce the victim into fabricating her testimony. Appellant fails to demonstrate a reasonable probability of a different outcome at trial had counsel cross-examined the victim as appellant confessed to committing the sexual assault. Therefore, the district court did not err in denying this claim without conducting an evidentiary hearing.

(ECF No. 14-22 at 3.) The Nevada Supreme Court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

In *Strickland*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Where a state district court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Harrington*, 562 U.S. at 104–05. In *Harrington*, the United States Supreme Court instructed:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," [*Strickland*, 466 U.S. at 689]; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*, 556 U.S. 111, 123 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential.").

Petitioner's trial counsel chose not to cross-examine J.F. (ECF No. 12-17 at 114.) Following Petitioner's trial counsel's hearsay objection to Detective Tooley's testimony about J.F.'s police interview statements, a sidebar conference was held. (ECF No. 12-22 at 60.) During that sidebar, following the state district court's indication that "it's not a *Crawford* issue because [J.F.] was subject to . . . cross-examination," Petitioner's trial counsel explained, "[w]hich I didn't want to do because she said everything I needed her

to say." (*Id.* at 63.) Petitioner's trial counsel then responded "[e]xactly" when the state district court commented, "[w]ell and what were you going to cross-examine her on" and "[y]ou were happy with her response." (*Id.*) Finally, Petitioner's trial counsel responded "[y]eah" when the state district court commented, "[s]o I understand why you didn't cross-examine her. You were happy with her response." (*Id.*)

Turning to Blanca, Petitioner's trial counsel cross-examined Blanca about several issues. First, Petitioner's trial counsel asked Blanca if it was correct that she never liked Petitioner. (ECF No. 12-17 at 130.) Blanca responded that she "ha[d] no reason to dislike him or like him." (*Id.*) Petitioner's trial counsel then asked Blanca if it was true that she told Detective Tooley that she never liked Petitioner, and Blanca responded in the affirmative and explained that her "reason of saying that dislike that day was because of what he did . . . to [her] niece." (*Id.* at 130–31.) Petitioner's trial counsel clarified that Blanca told Detective Tooley that she never liked Petitioner, and Blanca indicated that she remembered that. (*Id.* at 131.) In fact, Blanca then admitted that she never liked Petitioner. (*Id.*) Petitioner's trial counsel then asked Blanca about her feelings about her sister's relationship with Petitioner; her feelings about her sister and her sister's children moving out of her apartment to live with Petitioner; and the reduced time she got to see her sister's children after they moved in with Petitioner. (*Id.* at 131–32.)

Petitioner's trial counsel then asked Blanca if she "would always ask the children if [Petitioner] was touching them," to which Blanca responded, "[n]o, I asked them if everything was fine." (*Id.* at 132–33.) When Petitioner's trial counsel subsequently asked if Blanca asked J.F. "if her private parts were ever touched," Blanca responded that she "asked her a couple of times" but it was more akin to "telling her that if something like that ever happened to let [her] know." (*Id.* at 133.) Petitioner's trial counsel then questioned Blanca about her statement to Detective Tooley that she "was always asking [J.F.] . . . if her private parts were being touched." (*Id.*) Thereafter, Blanca admitted that she "did specifically and literally ask[ J.F.] if [Petitioner] had ever touched her." (*Id.* at 133–34.) Petitioner's trial counsel then asked Blanca if she dissuaded J.F.'s mother from

1    speaking to Petitioner about the allegations and if she believed J.F. was actually in pain

2    when Blanca touched her in the bath. (*Id.* at 134–35.)

3        Later, during Petitioner's trial counsel's closing argument, he focused, in part, on

4    Blanca's credibility and the possibility that Blanca influenced or implanted J.F.'s

5    accusations against Petitioner. Petitioner's trial counsel first commented that "[w]e don't

6    have any evidence whatsoever other than the statements of an individual that I would

7    severely question her credibility and her intent as to why she would say that, and that

8    would be the aunt." (ECF No. 12-22 at 177.) Second, Petitioner's trial counsel

9    commented that he did not think J.F. was lying, but he thought "that maybe she took [the

10   touching] out of context and everyone else here has placed it into a certain context for

11   her." (*Id.* at 179.) Petitioner's trial counsel then questioned, "[d]id Blanca start this whole

12   thing off" with her questions to J.F. in the bathtub and her previous questioning of whether

13   Petitioner ever did anything to J.F. (*Id.* at 180–81.) Specifically, Petitioner's trial counsel

14   commented that Blanca was "always ask[ing] them if they were touched in their private

15   parts" and suggested that these questions "would instill a suggestibility issue with the

16   children eventually over time." (*Id.* at 183–84.) Petitioner's trial counsel then questioned

17   Blanca's credibility because she admitted she did not like Petitioner. (*Id.* at 183.) Finally,

18   Petitioner's trial counsel commented that Blanca "wanted things to get into motion" by

19   calling child protective services before telling Betel about J.F.'s allegations. (*Id.* at 185.)

20       It is clear that Blanca and J.F.'s accusations against Petitioner were damaging to

21   Petitioner. It is also clear that Blanca and J.F. had potential credibility issues. However,

22   the Nevada Supreme Court reasonably concluded that Petitioner failed to demonstrate

23   that his trial counsel's performance in challenging their accusations or credibility was

24   deficient. *Strickland*, 466 U.S. at 688. First, although Petitioner's trial counsel did not

25   cross-examine J.F., it appears that this decision was strategic. Indeed, Petitioner's trial

26   counsel explained that he did not cross-examine J.F. "because she said everything [he]

27   needed her to say" on direct examination. (ECF No. 12-22 at 63.) In fact, as is further

28   explained in Ground Eight, J.F. testified during direct examination, contrary to her police

18

interview statement, that Petitioner only touched the inside of her vagina once and never touched her buttocks. (ECF No. 12-17 at 110, 113.) Turning to Blanca, Petitioner's trial counsel cross-examined her about the fact that she always disliked Petitioner—as opposed to her dislike stemming only from the accusations—and about the fact that Blanca had previously questioned J.F. about Petitioner inappropriately touching her. (ECF No. 12-17 at 133–34.) Petitioner's trial counsel summarized Blanca's credibility issues during closing argument by asking the jury to consider whether Blanca implanted J.F.'s accusations against Petitioner through her previous questions due to her dislike of Petitioner. (ECF No. 12-22 at 179–81, 183–84.) Accordingly, because the Nevada Supreme Court reasonably denied Petitioner's ineffective assistance of counsel claim, Petitioner is denied federal habeas relief for Ground Four.[5]

### E. Ground Eight

In Ground Eight, Petitioner alleges that his federal constitutional rights were violated when his appellate counsel failed to argue on appeal that there was legally insufficient evidence to support his lewdness conviction. (ECF No. 11 at 26.) Petitioner elaborates that the only evidence presented at trial supporting the lewdness conviction was the victim's prior, unreliable out-of-court statement, which amounted to hearsay and

//
//
//

---

[5]Petitioner also argues in his reply brief that his trial counsel failed to conduct a proper investigation in order to properly challenge Blanca's and J.F.'s accusations because a proper investigation would have disclosed: (1) that Blanca misled J.F. into making false allegations; and (2) that J.F. was hypersensitive to touching. (ECF No. 56 at 18–19.) In support of this argument, Petitioner cites to two declarations of Michele Blackwill, dated October 7, 2013 and October 8, 2013; a declaration of Maria Hernandez dated October 7, 2013; and a declaration of Cristina Zaragoza dated October 8, 2013. (*See id.* (citing ECF Nos. 14-25, 14-26, 14-27, 14-28).) First, these arguments were presented in Ground Five, which this Court dismissed as procedurally defaulted. (ECF No. 48 at 5.) Moreover, the Court is restricted from considering evidence that was not a part of the record reviewed by the Nevada Supreme Court at the time it ruled on the issue. *See Cullen*, 563 U.S. at 181 ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."). Here, the declarations were not made until after the Nevada Supreme Court affirmed the denial of Petitioner's first state habeas petition on February 13, 2013. (ECF No. 14-22.)

lacked sufficient details about when the act occurred. (*Id.* at 27.) In Petitioner's first state habeas appeal, the Nevada Supreme Court held:

> [A]ppellant argues that his appellate counsel was ineffective for failing to argue there was insufficient evidence for the lewdness conviction as the victim testified that appellant did not touch her buttocks. Appellant fails to demonstrate that counsel's performance was deficient or that he was prejudiced. Following the six-year-old victim's testimony that appellant did not touch her buttocks and that she did not remember telling the police that he had touched her buttocks, the district court admitted her statement to police that appellant had touched her buttocks as a prior inconsistent statement. *See* NRS 51.035(2). As the statement was properly admitted as a prior inconsistent statement, it was properly considered as substantive evidence that appellant improperly touched the victim's buttocks. *See Crowley v. State*, 120 Nev. 30, 35, 83 P.3d 282, 286 (2004). Accordingly, there was sufficient evidence presented to support the lewdness conviction. Appellant fails to demonstrate a reasonable likelihood of success on appeal had appellate counsel argued that there was insufficient evidence of the lewdness conviction. Therefore, the district court did not err in denying this claim without conducting an evidentiary hearing.

(ECF No. 14-22 at 5.) The Nevada Supreme Court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

The *Strickland* standard outlined in Ground Four is utilized to review appellate counsel's actions: a petitioner must show "that [appellate] counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them" and then "that, but for his [appellate] counsel's unreasonable failure to file a merits brief, [petitioner] would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285 (2000). In order to assess whether Petitioner's appellate counsel was ineffective, this Court must first assess whether a sufficiency of the evidence claim regarding the lewdness conviction would have been successful on appeal.

Petitioner was convicted of one count of lewdness with a child under the age of fourteen. (ECF No. 13-6.) That lewdness count provided that Petitioner "commit[ted] a lewd or lascivious act with the body of [J.F.], a child under the age of fourteen years, by touching and/or rubbing and/or fondling the buttocks of the said [J.F.], with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of" Petitioner or

J.F. (ECF No. 13-3 at 3.) At the time of Petitioner's acts against J.F. and his trial, NRS § 201.230(1) provided that a person is guilty of lewdness if the person "willfully and lewdly commits any lewd or lascivious act . . . upon . . . a child under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust or passion or sexual desires of that person or of that child." The Nevada Supreme Court reasonably concluded that there was sufficient evidence supporting Petitioner's lewdness conviction pursuant to NRS § 201.230(1).

Although J.F. denied that Petitioner "touch[ed her] butt" (ECF No. 12-17 at 110, 113), Detective Tooley testified that J.F. reported to her that Petitioner had touched her "[o]n her buttocks." (ECF No. 12-22 at 64.) Petitioner asserts that Detective Tooley's testimony about J.F.'s police interview statements was inadmissible hearsay. (ECF No. 11 at 27.) However, the Nevada Supreme Court, the final arbiter of Nevada law, determined that pursuant to NRS § 51.035(2), Detective Tooley's testimony about J.F.'s police interview statement was properly admitted as a prior inconsistent statement. This ruling was reasonable. J.F. testified at the trial that Petitioner did not touch her buttocks, Petitioner only touched her vagina once, and she did not recall speaking to a police officer at the hospital (ECF No. 12-17 at 110–111, 113). Accordingly, J.F.'s statement to Detective Tooley that Petitioner "touched . . . on her private areas . . . a lot" and touched her "[o]n her buttocks" (ECF No. 12-22 at 59–60, 64) was inconsistent. Because J.F. testified at the trial and was subject to cross-examination, there was no hearsay issue regarding Detective Tooley's testimony. *See* NRS § 51.035(2)(a) (stating that a out-of-court statement that is inconsistent with the declarant's testimony is not hearsay if the declarant testifies at the trial and is subject to cross-examination concerning the statement).[6]

---

[6]Petitioner also argues that he had no opportunity to confront J.F. on her police interview statement because she did not remember speaking to law enforcement and was not old enough to read, making confrontation with her prior statement impossible. (ECF No. 11 at 27.) However, as was discussed in Ground Four, Petitioner's trial counsel chose not to cross-examine J.F. because her direct-examination testimony was less damaging than her police interview statement.

Petitioner also asserts that the evidence lacked sufficient details about when the alleged touching took place. (ECF No. 11 at 27.) However, time is not an element of lewdness under Nevada law. *See* NRS § 201.230(1); *see also Wilson v. State*, 121 Nev. 345, 368-69, 114 P.3d 285, 301 (2005) (holding that "there is no requirement that the State allege exact dates unless the situation is one in which time is an element of the crime charged. Instead, the State may provide approximate dates on which it is believed that the crime occurred"). Thus, based on Detective Tooley's testimony, a rational trier of fact viewing the evidence in the light most favorable to the prosecution could have found, beyond a reasonable doubt, that Petitioner committed a lewd or lascivious act upon the body of J.F., who was under fourteen years old. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (holding that, on direct review of a sufficiency of the evidence claim, a state court must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"); NRS § 201.230(1); *see also Deeds v. State*, 97 Nev. 216, 217, 626 P.2d 271, 272 (1981) ("It is well established law in Nevada that in a rape case, a jury may convict upon the uncorroborated testimony of the victim.").

Further, there was testimony from Detective Hernandez that Petitioner had stated that J.F. was "very provocative" and that "he had the opportunity [to do other things] but that he had resisted." (ECF No. 12-22 at 67, 76–77.) Additionally, Betel testified that Petitioner "had told [her] that . . . when [J.F.] grows up and if she accepted that he would sleep with her." (ECF No. 12-17 at 72–73, 89–90.) Based on this circumstantial evidence, a rational trier of fact viewing the evidence in the light most favorable to the prosecution could have found, beyond a reasonable doubt, that Petitioner had "the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of" himself or J.F. when he committed the lewd act. *Jackson*, 443 U.S. at 319; NRS § 201.230(1); *see also Grant v. State*, 24 P.3d 761, 766 (2001) ("Intent need not be proved by direct evidence but can be inferred from conduct and circumstantial evidence.").

Because the Nevada Supreme Court's finding that there was sufficient evidence to convict Petitioner of lewdness with a child under the age of fourteen was reasonable, its finding that Petitioner's appellate counsel was not ineffective for failing to raise this claim on direct appeal was also reasonable. *See Strickland*, 466 U.S. at 688; *Smith*, 528 U.S. at 285; *Jones v. Barnes*, 463 U.S. 745, 754 (1983) ("For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client would disserve the very goal of vigorous and effective advocacy that underlies *Anders*. Nothing in the Constitution or our interpretation of that document requires such a standard.").

Petitioner is denied federal habeas relief for Ground Eight.

## V. CERTIFICATE OF APPEALABILITY

This is a final order adverse to Petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a certificate of appealability ("COA"). Therefore, this Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002). Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Applying this standard, the Court finds that a certificate of appealability is unwarranted.

## VI. CONCLUSION

It is therefore ordered that the first amended petition for writ of habeas corpus by a person in state custody pursuant to 28 U.S.C. § 2254 (ECF No. 11) is denied.

It is further ordered that Petitioner is denied a certificate of appealability.

It is further ordered that under to Federal Rule of Civil Procedure 25(d), the Clerk of Court is directed to substitute Renee Baker for Robert LeGrand as the Respondent warden on the docket for this case.

The Clerk of Court is directed to enter judgment accordingly and close this case.

DATED THIS 16th day of March 2020.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE